Hon. Edward V. Regan State Comptroller Department of Audit and Control
Your counsel has asked our opinion on the validity of a proposed change in the method used to carry out your duty to audit all State vouchers prior to payment, as required by section 1 of Article V of the Constitution.* (Section 111 of the State Finance Law follows the constitutional provision, but, as is discussed below, does not by its terms create the problem that the constitutional wording does.)
Specifically, you propose to institute a system of audit by scientific sampling, also known as statistical sampling. This is a system whereby an auditor is able to satisfy himself that the vouchers being audited are accurate without having examined every voucher or other document that supports the entries in the books of accounts. The need for this approach is particularly crucial where the volume of documents is large and the time within which they must be examined is short. Actual inspection is possible with enough examiners, but the cost is not justifiable if a proper statistical sample permits an auditor to certify the accuracy of the books of account secure in the knowledge that the dollar value of any errors would be less than the dollars that would have to be expended to find those errors. Put another way, if each voucher or other document is examined by someone, it is likely that errors will be found that statistical sampling will not find, but if each document is examined by two people, it is likely that still more errors will be found, and if three people examined each document even more errors might be found. In short, an auditor must use judgment in deciding how far to go to try to reach absolute zero in errors, a perfection that is literally unattainable.
Your counsel provided us with a copy of your consultant's proposal for establishing such a statistical sampling program for the pre-audit of vouchers. We do not consider it appropriate to pass judgment on the validity of the proposal. We assume that it is consistent with generally accepted auditing standards. (See "Relationship of Statistical Sampling to Generally Accepted Auditing Standards", Journal of Accountancy, July 1964, pp 56-58.)
We do note that sampling is proposed only for vouchers under $1,000, and that the percentage of vouchers to be sampled would vary from agency to agency depending upon the quality of the vouchers as submitted. That is, if an agency's submissions were relatively free of errors, the sample to be examined would be small. If an agency had a poor record, all vouchers would be examined until the agency improved the quality of its submissions. (Each agency is responsible, of course, for checking its vouchers before forwarding them to the Comptroller.)
Section 1 of Article V of the State Constitution provides:
 "The comptroller shall be required: (1) To audit all
vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties." (Emphasis supplied.)
The key question is the meaning of the word "all". Obviously, "all" cannot be read literally to require the State Comptroller personally to examine each voucher before payment. But if "all" is not to be read literally in that sense, does it mean that each voucher must be physically examined by somebody under his supervision or does it mean that all State expenditures are subject to audit before payment? We believe that the latter is the correct interpretation of "all". This is supported by the very words of the section: "prescribe such methods of accounting as are necessary". What you propose to do is to prescribe a certain method of accounting that assures that all vouchers are "audited" prior to payment.*
This reading of the section is supported by the history of the pre-audit provision. The words of section 1 as quoted above first appeared in the Constitution by an amendent adopted in 1925. That amendment was one of a series of amendments that salvaged the work of the 1915 Constitutional Convention whose product was defeated at the polls. (See Schick, The New York State Constitutional Convention of 1915 and the Modern State Governor [National Municipal League 1978], pp 131-133.)
At that convention, there was considerable discussion concerning the powers and duties of the Comptroller. The discussion did not focus on the nature of the auditing function. Rather, the complaint was that over the years the Legislature had given the Comptroller so many administrative duties that his auditing function was impaired, in part by having too many other duties and in part by being the person who audited his own accounts. (See New York State Constitutional Convention of 1915, Revised Record, pp 3319-3322, 3551-3557.) It is clear from the context of the debate that delegates were concerned that State funds be expended according to law, but it is not clear how the delegates wanted the Comptroller to carry out his auditing function.
In 1918, Alfred E. Smith, a leading delegate to the 1915 Convention, was elected Governor. He appointed a Reconstruction Commission on Retrenchment and Reorganization in the State Government. The Commission filed its report on October 10, 1919. In the discussion on the Department of Audit and Control, the Commission noted that the
 "* * * functions of audit and control should be vested in a single officer, elected by the people, so that he may be independent of the whole executive government of which he is the critic and upon which he is the check.
 "Serious defects are to be found in the provision of the Constitution relating to the office of Comptroller. In the first place it has established the office but has failed to prescribe the duties which are fundamental to it. In the second place it has failed to protect the independent character of the functions of audit and control. Thus it has left the Legislature practically free to prescribe by statute the powers and duties of the Comptroller.
* * *
 The functions of audit and control must be completely separated from the functions of planning and spending if there is to be effective check and efficient criticism." (Report of the Reconstruction Commission to Governor Alfred E. Smith on Retrenchment and Reorganization in the State Government, pp 53-54.)
Accordingly, the Commission recommended the creation of a Department of Audit and Control. In describing the functions of the Comptroller as head of the department, the Commission said: "All vouchers representing expenditures of the State's revenues will be audited and approved by him before payment is made" (id., p 56). The Commission also recommended that the Comptroller's fundamental duties "be outlined in the Constitution in order to prevent the assignment to his department by statute of purely administrative functions" (id., p 57).
So far as we have been able to find, the 1919 report is the genesis of the requirement that "all vouchers" be audited before payment. However, there is no discussion in the report concerning why this specific requirement was important, what the prevailing pre-audit practice was, or what was deficient about the practice. In 1925, the voters approved a new Article V of the Constitution that closely followed the recommendations of the Commission. The words quoted earlier from the present section 1 of Article V were in the 1925 version. In his Annual Report for 1932, the State Comptroller explained the purpose of the pre- audit*
requirement:
 "Since the adoption of this admendment to the Constitution, there has been a delay in complying fully with its terms in this respect owing to the failure of the legislature to repeal or amend certain statutes requiring the Comptroller to make advances for estimated expenditures and allowing the payments thereof to be made by disbursing officers of departments or institutions prior to audit by the Comptroller. I am clearly of the opinion that these statutes are now unconstitutional.
 "Moreover, may I call attention to the fact that the best evidence of payment consists of cancelled checks bearing proper endorsement. All accounting authorities are in agreement on this principle. Under present procedure, a very large percentage of State expenditures is now made by checks drawn by disbursing officers in various parts of the State, the said officers having sole custody thereof. Examples of fraud made possible by this procedure have been brought to light from time to time.
* * *
 "As further evidence that the present system is faulty and cumbersome, the fact should be noted that this department is forced to an unwarranted expenditure of time and effort in securing adjustments of erroneous payments, many months after the transactions are presumed to have been closed.
 "I am further firmly convinced, after observing the operation of the so-called estimate system, that it is antiquated, decidedly uneconomical, and that, in its present form, it has outlived its usefulness. On the ground of economy, may I point out that the preparation of minute detailed estimates involve a vast amount of unnecessary clerical and stenographic labor at the institutions, the central departmental offices and in this department as well. In my opinion the system in its present form necessitates a costly expenditure of effort on inconsequential detail, and therefore, with the necessity for economy pressing upon us, I am led to make the following recommendations.
"I recommend:
 "That all statutes requiring the Comptroller to make advances from appropriations be repealed or amended in such manner as not to conflict with the plain mandate of the Constitution requiring the Comptroller to audit all vouchers before payment.
"I also recommend:
 "That the statutes providing for the so-called estimate system be either repealed or amended so as to bring about a more modern and economical method of administration." (P xxvii; see also p xxxiv.)
In essence, the Comptroller was explaining what auditing "all vouchers before payment" was designed to accomplish. Many agencies disbursed their appropriated funds by issuing their own checks. To obtain these funds the agencies had to prepare estimates of how much was needed. On the basis of these estimates, the Comptroller advanced funds. Thus, the Comptroller had no way of knowing until long after disbursement whether the disbursements were according to law. The 1925 amendment, in effect, transferred disbursing power to the Comptroller. The complaint registered by the Comptroller in his 1932 report was that the Legislature had failed to change the system to conform to the constitutional mandate.
In the Constitutional Convention of 1938, the Committee on the Governor and Other State Officers proposed to leave unchanged the portion of section 1 of Article V prescribing the duties of the State Comptroller (Revised Record, p 2330). From the floor Judge Francis Bergan offered an amendment to section 1 to add what is now the sentence following the sentence quoted earlier:
 "The payment of any money of the State, or of any money under its control, or the refund of any money paid to the State, except upon audit by the Comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the Supreme Court in Appellate Division on notice to the Attorney-General." (Id., p 2349.)
In explaining his amendment, Judge Bergan said of the Comptroller:
 "The requirement that he audit all vouchers is perhaps too narrow a definition of his function, because there have grown up under various statutes provisions which allow the payment of State moneys without actual audit by the Comptroller on the one hand, and provisions, particularly, which allow the refund of certain moneys paid to the State, on the other, without any real audit by the Comptroller. There are also certain agencies of the State which control and have possession of moneys which are not properly State moneys and which pay out, as the Insurance Fund does, moneys without any audit by the Comptroller.
 "The refunding of taxes paid to the State, particularly through the Tax Department, is permitted by several statutes without audit by the Comptroller. The stock transfer tax, for instance, permits of the refunding by the Tax Department of claims made for erroneous taxes or erroneous attachment of stamps upon stock transfers, from any moneys in the possession of the Tax Department which have come from the transfer tax; and so that these funds are payable by the Tax Department without any independent audit by the Comptroller.
 "There is also authorization for the refund of franchise taxes at the direction of the State Tax Department. And in respect to such refunds the Comptroller's duty is wholly ministerial, and under a statute he acts without exercising any independent power of audit." (Id., p 2350.)
In his 1938 Annual Report, the Comptroller* said:
 "Your Honorable Bodies are, of course, aware that the people at the last general election adopted an amendment to Section 1 of Article V of the Constitution providing, in effect, that any payment of moneys out of State funds, or funds under State control, shall be void unless pre-audited by the Comptroller.
 "You are also aware that while the Constitution, even before this amendment was adopted, provided that the Comptroller `shall audit all vouchers before payment,' it had been deemed expedient, for practical administrative reasons, for the Comptroller to operate in many instances under statutory provisions concerning advancements and revolving funds.
 "The new Constitutional provision, however, appears so specific and all-inclusive that this procedure is no longer possible. The people have expressed their will in no uncertain terms. Compliance with this provision will naturally require a thorough overhauling of the entire auditing procedure of all the State departments and agencies.
 "It appears no longer legal for institutions, commissions and other agencies of the State to make payments of payrolls and other claims out of funds advanced by the Comptroller and to submit the supporting vouchers to the Comptroller for post-audit. Inasmuch as expenditures from State funds amounting to nearly $50,000,000 and involving the issuance of about 800,000 payroll checks and 255,000 checks to other claimants had not previously been subject to the Comptroller's pre-audit, immediate steps have been taken to make such changes in the audit and accounting procedures as will insure prompt payment of claims and still comply with the new Constitutional provision." (Pp xxxvii-viii.)
In 1939, the Legislature added to the State Finance Law what is now section 111 (L 1939, ch 947, § 1). The addition also in effect superseded the many provisions of law about which Comptroller Tremaine had complained (id., § 3). Section 111 provides in pertinent part:
 "No moneys of the state, including moneys collected in its behalf, and no moneys in the possession, custody or control of any officer, agent, or agency of the state in his or its representative capacity, and no moneys in or belonging to any fund or depositary, title to which is vested in the state, shall hereafter be paid, expended or refunded except upon audit by the comptroller."
It is to be noted that under this statutory formulation, no noney is to be paid out except "upon audit"; the "all" of "all vouchers" has disappeared.
We conclude that the constitutional history of section 1 of Article V clearly demonstrates that "all" referred to the necessity of giving the Comptroller pre-audit power over all vouchers and was not intended to define how the Comptroller is to carry out the pre-audit function. We conclude that your duty to audit "all vouchers" is satisfied if you audit those vouchers in a manner that is consistent with generally accepted auditing standards.
* Auditing prior to payment is know as "pre-audit"; auditing books, including examination of supporting vouchers, after payment is known as "post-audit".
* An "audit" is "[a] formal or official examination and verification of accounts, vouchers, and other records" (Webster's New International Dictionary, Second Edition, Unabridged). We have been unable to find any authority that gives "audit" a special meaning in law.
* It is worthy of note that the index to Arthur Levitt's "Watchdog for the People, A History of the Comptrollership of New York State" (1967, mimeograph, Department of Audit and Control), under the heading "Pre-audit" gives as the first entry the pages discussing the Comptroller's 1932 Annual Report.
* The State Comptoller was Morris S. Tremaine, who served from January 1, 1927, to his death on October 12, 1941. He was also a delegate to the 1938 Convention.